(37 South. 995.)

No. 15,057.

DUGUE v. LEVY.*

(Dec. 5, 1904.)

BUILDING CONTRACT — ARCHITECT'S CERTIFI-
CATE—PERFORMANCE—CANCELLATION
BY OWNER.

1. When a building contract stipulates that the work shall be done under the supervision of an architect, and that payments shall be due only upon the production of a certificate from such architect, the architect is made primarily the judge of whether the contract has been fulfilled or not, and his findings in that regard should not be lightly overruled; but if his refusal of a certificate is dictated by caprice or prejudice, and the contractor is evidently entitled to be paid, and the owner is so advised, payment must be made despite the nonproduction of a certificate.

2. A substantial performance of the contract is all that the law requires, and the employer will not be permitted to avoid payment because the strict letter of the agreement has not been carried out. Slight deviations, or technical, unimportant, or inadvertent omissions or defects, will not bar recovery.

3. The proprietor who exercises the right accorded him by article 2765, Civ. Code, to cancel at his pleasure the building contract, must pay the contractor for all expenses incurred and for all labor done, and, in addition, all damages his act may have caused, such as the loss of the profits the contractor would have made if he had been permitted to complete the building; but he is not liable for such consequential damages as the loss of reputation and credit the canceling of the contract may have caused to the contractor.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by Joseph Dugue against Samuel Levy. Judgment for plaintiff, and defendant appeals. Reversed.

James Barkley Rosser, Jr., for appellant. Farnell Mitchell Milner, for appellee.

PROVOSTY, J.     The plaintiff, Joseph Dugue, contracted to build for the defendant, Samuel Levy, a two-story brick building.   The work was to be done under the supervision of an architect—the same who

*Rehearing denied February 13, 1905.

had prepared the plans and specifications for the building. The architect found fault with the manner in which the foundations were being built—that the offsets were not regular, nor according to the specifications. This Dugue remedied. Next, one of the walls of the foundations was found to be some four inches away from the line where it was desirable that it should be.   This mistake, however, had been that of the specifications, not of Dugue. He nevertheless, under the instructions of the architect, remedied it. The specifications required that the dampproof courses of slate should be laid lapjointed. The architect complained that the slates had not been thus laid. Dugue maintained that they had, and the preponderance of the evidence so shows; and the judge a quo so found, as, indeed, the judge of Division E of the lower court (Judge Theard) had found when the same issue was tried before him in a suit for the recovery of the first installment of the contract price.   A complaint that the proper amount of cement was not being added to the mortar was well founded. But the fault lay with the copy of the specifications furnished to Dugue, which read "½ shovels full," instead of "1 & ½ shovelfuls."

The walls had been raised about seven feet when the architect called to the attention of Dugue that the work was being bonded at every sixth course, instead of at every fifth course, as required, and also that the joints and seams were not being filled solid with mortar; and he added: "You are hereby requested to remedy these defects forthwith."     The architect testifies that this meant to take down the work and rebuild it. Perhaps the words are susceptible of that construction, but, if that was meant, it would have been just as easy to have said so. Dugue and the foreman bricklayer testify that while on the work the architect not only did not tell them to take down the work, but expressly consented that it should stand, and

that thereafter the bonding should be at every fifth course. Dugue says that when he received the written instructions, "You are hereby requested to remedy these defects," he understood them in the sense of the verbal instructions of the architect, namely, that the bonding should thereafter be at every fifth course. The fact is that under the circumstances the architect would not have been justified in requiring the demolition of the work. The departure from the specifications had been unintentional—usually the bonding is at every sixth course—and the work had not progressed far enough for the discrepancy to make any practical difference in the solidity or durability of the wall. With the bonding at every fifth course, there would have been a bond at every 18 inches; at every sixth course, there was one at about every 21 inches. The wall had reached, say, 6 feet, or 72 inches. The difference was half of one bonding. The architect, Mr. Paul Andry, says it would have made no practical difference in the wall.

"A substantial performance of the contract is all that the law requires, and the employer will not be permitted to avoid payment because the strict letter of the agreement had not been carried out. Slight deviations, therefore, or technical, unimportant, or inadvertent omissions or defects, will not bar recovery." A. & E. Ency. (1st Ed.) vol. 29, p. 801.

As to the filling of the joints and seams, the architect was on the work every day, and seems to have been lynx-eyed in the discharge of his functions, and yet he did not notice, or, if he noticed, did not call to the attention of Dugue, the manner in which the bricklayers were filling the joints and seams, until the foundations had all been constructed, and the walls had attained a height of some six feet. Here, then, is presented a dilemma. If he noticed this defect earlier, he should have called it to the attention of Dugue, and not waited until the work had been done, and then required it to be undone. If, on the other hand, he failed to notice this defect before the time of his giving notice, how could he know that the defect existed in the work theretofore done?

Both from the preponderance of the evidence and from its greater probability, the court believes the statement of Dugue that by the instruction to "remedy these defects" the architect meant nothing more than that thereafter the bonding should be at every fifth course, and the joints and seams be better filled. Thereafter the work was bonded at every fifth course. The complaint as to the joints and seams not being properly filled was not well founded. The court is satisfied from the evidence as a whole that the masonry was as well done as work of similar character usually is done.

The next complaint was that the old and the new joists were interspersed, instead of being laid separately—all the old together and all the new together. The specifications were silent regarding the manner in which these joists should be laid. The architect required Dugue to take them up and lay them separately, and he complied. In view of the fact that architects and builders differ as to which is the better distribution of such old and new joists, it is evident that the action of the architect in thus requiring the taking up and relaying of these joists was arbitrary and unfair.

Complaint was made also as to the ground-floor joists not being anchored. This defect was remedied. In justice to Dugue it may be well to state that ground-floor joists are not usually required to be anchored.

Complaint was made that the brick piers supporting the rear frame walls were not in their proper positions. Dugue denies that this complaint was well founded. The architect, in his testimony, does not say that these piers were not in position, but that they were insufficient in size—a strange shifting of his ground of objection. There is no evidence on the part of defendant going to support the complaint. Later the architect formulated against the same piers the vague

objection that they "were not properly built." In his testimony he says they were of three bricks, when they should have been of three and a half bricks. Dugue testifies that they were of three and a half bricks, and he is borne out by the other evidence in the case.

The next objection was as to the position of certain iron columns. Upon measurement this objection was found to be unfounded. The same thing can be said of the proposed unequal projection of the window sills.

The wrong bedplate had been used for one of the columns, but this was rectified. In remedying this defect, Dugue was required to take down more brickwork than was necessary.

It was objected that two of the window frames appeared to be out of plumb, but the defect was only in the strip holding the sash, and was rectified.

Objection was made that the front iron columns were not placed as per plan. Dugue testifies that the architect was mistaken in that regard, and so found out upon measurement. The architect testifies the defect was remedied.

Complaint was made that the steel beam lintels were being placed in position without having been painted. On the trial of the suit for the recovery of the first installment of the price, the architect testified that these lintels had not been painted on the inside, and Dugue testified that they had been painted. At the suggestion of the parties the judge went to the building, and had so much of the brickwork taken down as would reveal the inside of these lintels, and afford ocular evidence of whether they were painted or not. They were found to have been painted.

Objection was made that the lintel beams had no separator plates, as required by the specifications. This objection was not sought to be substantiated by any evidence.

Other objections were made during the progress of the work—that the iron columns were not properly faced, so that the lintel beams might sit true upon them, without any interstice between lintel beam and top of column; that the mortar did not have the proper admixture of cement; that the masonry work was not plumb, nor faced properly where it had to be faced; that off-color brick were admitted into the faced walls, contrary to the specifications; that the brick were not kiln run, as required by the specifications; that the flues were not properly constructed.

On all these points the testimony is hopelessly conflicting; the preponderance of it being, however, except as to the flues, which were afterwards remedied, with the plaintiff. The gravamen of the architect's complaint regarding the iron columns was that they had not been faced in a lathe. The preponderance of the testimony shows that in New Orleans they are not usually so faced, unless specially so required in the specifications, and the specifications did not so require. The question of the mortar is the same that has already been dealt with herein. The masonry work must have been as plumb as such work usually is; otherwise it is simply impossible that the disinterested experts—men of the highest standing in their profession— should have found it satisfactory. Some off-color bricks that had crept into the faced walls were removed, and therefore this ground of complaint ceased to exist. The bricks are shown overwhelmingly to have been strictly according to the specification.

When the building had been brought to the point where the first installment of the price was due, plaintiff called upon the architect for his certificate. It was refused, and the refusal was accompanied by a demand that plaintiff take down the entire structure and build it anew. Plaintiff demanded that the grounds of the refusal be stated. The architect enumerated all the grounds hereinabove mentioned.

Plaintiff brought suit for the amount due, $1,500, alleging that the refusal of the certificate was arbitrary.

A protracted trial followed, involving the same inquiry as is involved in the present suit, namely, the manner in which the plaintiff had executed the work, and the quality of the materials.

In the course of the trial the testimony became so conflicting that, as already stated, the trial judge (Judge Theard), at the suggestion of the parties, went to the building in order to satisfy himself by a personal inspection. He found that plaintiff and his witnesses had been right, and defendant and his witnesses wrong, on the several points which came under his personal observation.

After a hearing of the entire case, he gave judgment for plaintiff. He stayed execution, however, until plaintiff should have rectified the work in some minor particulars in which it did not conform with the specifications. He found that the architect had been arbitrary in his relations with plaintiff—especially in demanding that the entire work be taken down, instead of merely that it be corrected in the particulars wherein it was deficient.

The case went to the Court of Appeal. There the judgment was affirmed by all three judges on the original hearing, but on rehearing it was set aside, and plaintiff nonsuited; one of the judges still adhering to the original opinion.

The judgment of the Court of Appeal is not in the record, but we gather from the record that the Court of Appeal did not differ with Judge Theard on the facts, but only on the application of the law to the facts. To be more specific, Judge Theard thought that the minor particulars wherein the work was deficient, all susceptible of correction at a trifling expense, should not bar recovery; that a substantial compliance with the contract was sufficient, where the only shortcomings found could thereafter be easily rec-

tified, and would have been rectified upon demand. The majority of the Court of Appeal, on rehearing, thought that before plaintiff could recover he had to show a strict compliance with the very letter of the specifications.

The date of the discontinuance of work on the building and of the demand of payment of the first installment of the contract price was the latter part of August, 1900. The date of the termination of the litigation was June, 1902. During all that time the incomplete structure remained exposed to the weather. As soon as the litigation terminated, Dugue gave notice to defendant and to the architect that on a day and at a time named he would be at the building with a force of workmen, and would correct the imperfections found by the judgment of the court, and would then again demand his certificate. To ·this the attorney of Levy replied on July 1st that Levy required that the completion of the building should be strictly in accordance with the plans and specifications, and not merely in accordance with the judgment of Judge Theard, which had been set aside on appeal; and he added that, in default of Dugue's doing so, Levy would proceed on July 2d (the next day) to advertise for bids for the completion of the building.

On the next day (July 2d) Dugue replied by the following letter:

"New Orleans, La., July 2nd, 1902. Samuel Levy, Esq., City—Dear Sir: I have received a letter from your attorney to my attorneys, stating that you will begin to advertise my contract with you for completion by other parties this day. I beg to notify you that this is an answer to a letter by my attorneys to your attorney notifying you that I should be at the building this morning at 9 o'clock for the purpose of going on with my contract according to plans and specifications and doing such work as will under the recent opinions of the Court make me literally comply with my contract. I demanded that the architect, be present as your representative to give me such instructions and assistance as the case requires.

"I beg to notify you that your architect failed to show up. I have one man at the building making mortar beds, and to-morrow morning I.

shall be at the building at 9 o'clock with a force of men and I again demand that your architect be present and that he give me his instructions. I also demand that these instructions be delivered to me in writing so that in the future neither party can be mistaken as to what Mr. Fitzner has demanded. Upon your failure to act in this matter, I shall do such work as in my opinion will bring the contract strictly according to plans and specifications up to the point of first payment, and then I shall again demand the first payment certificate from your architect and payment from yourself.

"Respectfully," etc.

Neither Levy nor his architect paid any attention to this notification, and Dugue proceeded to rectify the imperfections found by Judge Theard; and, when he had done so, he, on July 11th, notified the architect of that fact, and again demanded his certificate. The response was a letter, dated the 11th, notifying him to take down his work and remove his materials from the grounds; otherwise that the same would be done at his expense. The letter was from the attorney of Levy. It expressed a willingness on the part of Levy to retain the foundations of the building at whatever valuation experts might fix upon them. Finally it required that an answer be given by the 14th.

On the 18th Dugue wrote to Levy the following letter:

"July 18th, 1902. Samuel Levy, Esq., City— Dear Sir: Replying to your notice of the 17th inst., supplementing your letter of the 11st inst. calling on me to appoint an appraiser to value the foundations, I beg to say, I decline to do so, as I cannot admit your right to tear down my work.

"I demand of you again my first payment of $1,500.00 on the ground of the arbitrary, unreasonable and malicious actions of your architect towards me on this contract and his refusal to give me my first certificate, after complying with all his reasonable demands. His and your demand that the entire work should be demolished because it is not according to specifications and plans is outrageous and malicious and I shall hold you liable in damages.

"On Monday I shall either bring suit for my first payment coupled with an injunction, if I am able to procure bond or I shall sue you for the value of my work by reason of your violation of contract, together with such damages as you have caused me by your action.

"I now demand of you payment of an amount of $61.60 expense incident to disclosing the inside of lintels to allow the court to judge whether they were painted or not. You agreed to pay for this and the agreement is of record.

"Your whole desire is to demolish my work so that you can prove or attempt to prove that it was not done in accordance with plans and specifications. You well know that you cannot let it stand and win your case. I now challenge you to arbitrate the matter before reputable arbitrators, one to be appointed by you and one by me, and the umpire to be appointed by the two, the decision of any two of them to be final and binding.

"Yours very respectfully," etc.

On the 6th of August, Dugue filed the present suit, claiming a second time the amount of the first payment, $1,500, and asking for an injunction to prevent the demolition of the building. The injunction issued, but was dissolved on a showing that the sureties were insufficient. Thereupon Levy proceeded to tear down the structure and cart away the materials, and Dugue converted his suit into one in damages. He claims as follows:

| | | |
|---|---:|---:|
| Entire price of contract, inasmuch as he owed under contracts for materials furnished and to be furnished, and labor done, and was entitled to his profit, say.......... | $7,500 | 00 |
| He also claimed damages to his credit | 3,000 | 00 |
| Damages to his reputation........ | 1,000 | 00 |
| Loss of profit and business generally | 4,000 | 00 |
| Cost of disclosing paint on lintel as under agreement in open court due by Levy ...................... | 61 | 60 |
| Changing foundations under arbitrary demand of Fitzner after they had been put in right............ | 100 | 00 |
| Changing floor joists after they had been put in incorrectly............ | 30 | 00 |
| Damage to his work, making holes in brickwork ...................... | 16 | 00 |
| Value of girder lost, due to mistake of architect ...................... | 21 | 00 |
| Exact cost of change of stairs, due to mistake of architect.......... | 57 | 00 |
| Paid watchman during litigation to watch building, not contemplated in contract .................... | 368 | 00 |

The trial lasted 27 days. There are 1,419 pages of testimony, and an additional transcript of 218 pages. Before and during the progress of the demolition of the structure the work was examined by prominent architects and builders, who have testified in the case.

The judge a quo (Judge Sommerville) gave

judgment for plaintiff. He allowed for cash expended in labor and materials, $2,383; for the profit which Dugue would have realized, had he been permitted to complete his contract, $750, or 10 per cent. on the amount of the contract; for damage to credit and reputation, $1,000; for costs of disclosing inside of lintels, $61.60; for part of the bill of one of the materialmen, $105; for cost of repairing some holes made in the wall by Levy, $16; a total of $4,315.60; or, by an error in the judge's addition, $4,238.

However much defendant may have thought himself in the right at the beginning of the controversy, it would seem that the decision of Judge Theard, after a full hearing of both sides, should have convinced him that the work was not so bad as to justify tearing it down and carting away the materials. If he still desired to litigate the matter, he should have left the work standing, so that it might speak for itself. When the certificate was refused, Dugue was prompt to appeal to the courts; and defendant should either have acceded to the demand, or awaited the decision of the courts. By destroying the work he lay himself open to the imputation which Dugue raises against him in his letter transcribed above— of having destroyed the work in order that it might no longer be there to speak for itself. While the court acquits him of any such intention, yet he lay himself open to the imputation.

It is very evident that Dugue had in some way or other incurred the displeasure of the supervising architect, and that the latter was disposed to be overexacting with him. A strong case must be made out, to induce the courts to overrule the decisions of the supervising architect, but this case is of that character.

The stipulation in the contract that the payments were to be made only on the certificate of the supervising architect is no pro-tection to the defendant. The certificate was refused through caprice and prejudice, and that fact was amply brought to his knowledge.

The contention of plaintiff is that, as objections were made during the progress of the work, he in good faith corrected them, and that he thought the architect was satisfied. The contention of the architect is that plaintiff did not make the corrections. If so, from the moment he saw that his injunctions were not being obeyed, he should have advised plaintiff positively that unless they were obeyed no certificate would be given. If his intention was to require the demolition of the entire work, he should not have lent the countenance of his presence and of his supervision to the work which was being piled upon the work that would have to be taken down. Such conduct was of a nature to lead plaintiff to suppose that the corrections were satisfactory.

The conclusion from the foregoing is that plaintiff was not in default, and that defendant was in default, and that the act of defendant in taking the work out of the hands of the plaintiff can be viewed in no other light than as an exercise of the right of the proprietor to put an end to the building contract at any time, under article 2765, Civ. Code. That article reads as follows:

"The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expenses and labor already incurred, and such damages as the nature of the case may require."

This article has been applied in the following cases: Villalobos v. Mooney, 2 La. 331; Joublanc v. Daunoy, 6 La. 656; Dufour v. Janin, 8 La. 147; Moore v. Howard, 18 La. Ann. 635; Forrest & Crocker v. Caldwell & Hickey, 5 La. Ann. 220; Monarch v. Board of Com'rs, 49 La. Ann. 991, 22 South. 259.

As said by Marcade in his commentary upon the corresponding article of the Code

Napoleon (article 1794), the terms of the article are so plain that they need no elucidation.

The terms of our article 2765 are, however, somewhat broader than those of article 1794 of the Code Napoleon. The language of the Code Napoleon is that, in addition to expenses and labor, the proprietor must pay all the profits that the contractor might have made by being permitted to complete the building. Our article requires him to pay, over and above the expenses and labor already incurred, "such damages as the nature of the case may require." The idea of each, however, is the same—the proprietor, on the one hand, shall have the legal right to put an end to the contract, and the contractor, on the other hand, shall be placed in as good a position as he would have been if he had been permitted to complete the contract.

But by canceling the contract defendant was merely exercising a legal right, and therefore he does not owe plaintiff anything for remote and consequential losses, such as loss of reputation and loss of profits on other business. These are mere accidents resulting from the debility of plaintiff's financial legs, and not from defendant's fault.

If defendant were guilty of any tortious behavior towards plaintiff, in word or act, and plaintiff suffered damages therefrom in reputation or financial credit, that would be another matter—a matter outside of the contract, giving rise possibly to an action ex delicto, but not falling within the purview of article 2765.

While the evidence in the case is exceedingly voluminous on the character of plaintiff's work and materials, it is astonishingly scant on the question of the exact amount of the loss suffered by plaintiff from the action of defendant.

The court ruled out the evidence offered by

plaintiff to show that he was liable on contracts for materials which had not yet been put into the building, and not been paid for. But evidently if plaintiff had contracted for these materials, and the parties he contracted with have held him to his contracts, and he has been unable to dispose of the materials at the same price, he has suffered a damage; and, even if he has been able to dispose of the materials at the same price, he ought to recover the value of his time and labor in the work of disposing of them. Whether plaintiff has paid for the materials or not is not a question with which defendant has any concern, except in so far as defendant may have had to pay for them himself. Of course, he is entitled to credit for whatever he may have had to pay out for the account of plaintiff.

Then, again, if defendant pays for the materials put into the building by plaintiff, he is entitled to keep them. But we gather that they were carted away and delivered to plaintiff, who accepted them. If so, defendant is entitled to a further credit for whatever was the value of this secondhand material.

The case must be remanded for further trial along the lines hereinabove indicated.

To facilitate matters, the court will add that the items of $61.60 for repairing wall, and $16 repairing holes in brickwork, have been proved, and that plaintiff is entitled to recover for whatever may hereafter be proved to have been the exact cost of changing foundations, changing joists, changing stairs, and maintaining red lights and watchman pending litigation.

The judgment appealed from is therefore set aside, and the cause is remanded for further trial as hereinabove indicated; plaintiff to pay the costs of the appeal, and the costs of the lower court to await the final determination of the cause.