**WESTERN UNION TEL. CO.**

**v.**

**R. J. JONES & SONS.**

**No. 14512.**

United States Court of Appeals
Fifth Circuit.

March 19, 1954.

Rehearing Denied June 24, 1954.

H. Payne Breazeale and Robert P. Breazeale, Baton Rouge, La., John H. Waters, New York City, for appellant.

Fred G. Benton, Edward Donald Moseley, Benton & Moseley, Baton Rouge, La., Gravel & Downs, Alexandria, La., for appellee.

Charles D. Marshall, New Orleans, La., Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel, amici curiae.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Appellees are building contractors at Alexandria, Louisiana, and along with others submitted a bid for certain work of enlarging, repairing and remodeling a dining hall and kitchen at one of the educational institutions in Louisiana located at Natchitoches. Under the terms of the advertisement for bids, all were

required to be filed by 10:00 o'clock A.M. November 27, 1948, in the Office of the Board of Education on the 16th floor of the State Capitol Building in Baton Rouge, Louisiana. These bids were required to be in writing on certain forms furnished by the Board and to be sealed, that is, presumably no one other than the individual bidder would know the figure submitted until they were all opened at the same time on a stated date.

On the morning of November 27, 1948, the day the bids were to be opened, about 7:30 A.M., appellees, R. J. Jones & Sons, a partnership, filed with appellant a telegram on the usual form and carrying the ordinary rates for unrepeated messages, reading as follows:

"Alexandria, La.
"1948 Nov 27 AM 7 33

"To *Mr. Brown c/o State Board of Education*

"Care of or Apt. No. *16th Floor of State Capitol Bldg.*

"Street and No. *Baton Rouge, La.*
"Place                                        X.

"Deduct $4,000.00 from our bid on alteration and repairs to Dining Hall and Kitchen at Northwestern State College, Natchitoches"

The message arrived at the main office of appellant at 8:11 A.M. of the same day and was placed in the hands of a messenger for delivery to the named addressee. On reaching the Capitol Building he found most of the offices closed because it was a general holiday. He then took the message to the thirteenth floor and slipped it under the closed door of the Insurance Division of the Secretary of State, about 9:30 A.M. Thereafter a member of that Department entered this office and found the message in question along with others. It was then taken to the proper office on the sixteenth floor and placed in the hands of the addressee between 10:20 and 10:30 A.M., after the bids, three in number including appellee's, had been opened. The bidders and amounts were as follows: Barnet Brezner, $218,-784.00; Jones & Sons (hereinafter called Jones), $212,497.00 and Tudor Construction Company (called Tudor), $211,799.00. The Board of Education on consultation, was advised by the State Attorney General that appellee's telegram making a reduction of $4,000.00 in its bid and reducing the same to $208,497.00, or some $3,302.00 less than Tudor's could not be considered and the work was awarded to the latter.

Thereupon appellees brought this suit for a negligent breach of the contract to properly transmit and deliver the message, claiming the sum of $25,000.00 damages. The case was tried without a jury and the lower court, without opinion, but upon detailed findings of fact and conclusions of law, rendered judgment for appellee in the sum of $23,166.33, from which this appeal was taken.

In view of the conclusion which we have reached, it would serve little purpose to undertake an analysis of the pertinent law and decisions on the question of the right of appellant to limit its liability as provided in the forms used for sending this message.

In attempting to prove its damage or the loss of profit, appellee used as witnesses members of its own firm and the head of the successful bidder, Tudor. There is no doubt but that the appellee was a reputable building firm of many years experience in the trade and was composed of a father and two sons. One of the latter, Robert H., was its principal witness and stated that he was the estimator charged with the responsibility of properly figuring their jobs. He was called as the first witness and his testimony consisted mainly of an analysis of his firm's bid, including the factors which entered into it. He, of course, figured up labor and materials, overhead, insurance, etc., but put all subcontracts, such as plumbing, painting, etc., in the materials column. He then added to the total estimate a commission or profit of twelve and one-half percent on a job which all the witnesses indicated was somewhat hazardous, to wit,

the remodeling and enlarging of old buildings. His method is revealed in the following series of questions and answers:

"Q. Just exactly how was this estimate prepared? Explain just how—just exactly what it shows, in each column? A. Well, you have a column of quantities; then you have a unit of material; then you have a total labor, total material, subcontracts that carried in the line of materials column; then you have a subtotal on the other end. You add it all up on your whole complete total and that gets the cost of your job, with your overhead and everything in it. Then, the profit is added on the bottom. That is what this constitutes."

Later he stated:

"I had a total cost of $188,886.23; anticipated profit $23,610.77; approximately twelve and a half percent on a remodeling job."

This, of course, was before the attempted reduction of $4,000.00 from the original bid.

The court below gave judgment for the sum of $23,166.33, which was only $444.44 less than the first estimate. Quoting further from the direct examination:

"Q. What effect, if any does this deduction of $4,000.00 have on this profit figure shown in this statement of $23,610.77? A. It didn't have any.

"Q. It didn't have any, because you took it off of the gross after you deducted the profit. Is that correct? A. I took the $4,000.00—I arrived at $4,000.00 in this way: In estimating the sheet there, we went on down and we had to get our bid in by a deadline. After we once had our bid submitted and it was in the hands of authorities toward the contract, we go back and check all the quantities, check our labor, go back and see if we have any better subheads. We did that early that

morning. By six o'clock we were in the office refiguring this job. We arrived at $4,000.00 by checking back on our masonry items, which are quite a bit; there were a number of masonry items, and we found out we had a savings of $4,000.00 up in our masonry unit. We did not touch the profit end. We said, "We will deduct $4,000.00 which should put us low enough to get the job.' That is what we did. We did not touch the profit end of it at all.

"Q. I don't know that I quite understand you?

"The Court: He means, if you had saved $4,000.00 off of the $212,-497.00, then your profit would be the same. A. Yes, sir.

"The Court: *If you had not been able to economize, cut down to that point your profit would not be the same.* (Emphasis by the writer.) A. *That is right.*" (Emphasis by the writer.)

Further on the matter of profit, the witness testified:

"Q. Now, Mr. Jones, when—one other question: considering all the factors mentioned, including market conditions prevailing when you made this computation, and the market conditions prevailing thereafter during the period of construction, what losses do you claim your firm suffered by virtue of the fact that you did not obtain this contract? A. My company loss profit of approximately $25,000.00 by not obtaining that contract.

"Q. Just how do you explain the difference between $25,000.00 and this figure of about $23,000.00 that you included in your original estimate? A. I said 'approximately' $25,000.00. You have just got to assume we would probably have made more money than what we show there. On a remodeling job an estimator has to take a lot of things into consideration. We figured it on the outside instead of figuring it

close. We figure everything bad; then, if we hit it and it is not as bad as it looks we make that. If we go and drop a building we have to take the loss.

"The Court: Were you still figuring on the outside when you took $4,000.00 off? A. Yes, sir; we were figuring on the outside. A few quantities in there is what governed that."

His examination then proceeded along the line that there was plenty of labor available at prices either stable or improving from the contractor's standpoint, because work was not so plentiful and labor would therefore give more efficient service. At the time its bid was submitted the firm was engaged in completing a dairy job for the same school, and claimed that it had ample facilities to complete the work within the 335 days its bid required although the successful bidder had estimated 200 days and admitted the job took about a year. There is no conclusive proof appellee's bid, which was only $3,302.00 less than Tudor's would have been accepted, in view of its requiring 135 days longer than Tudor. It was shown the Board of Education was in a hurry to have the job completed, and could have justified acceptance of the latter's bid on that ground.

The following is quoted from his cross examination:

"Q. Major Brown testified to the fact that the man who did get this contract ran into considerable difficulty in completing it. Do you know of your knowledge what difficulty was run into? A. Well, if I remember right and heard right, Mr. Brown said it was in receiving materials. That was one object that he had that he ran into.

"Q. Now, you testified that the material situation was very stable during this period. Why would there have been a difficulty in getting material on this job? A. By stable, I meant price.

"Q. But deliveries were not stable. Is that right? A. Deliveries had not been stable for quite a while.

"Q. Isn't it a fact, then, if you are not able to get your materials when they are called for that that is going to cut into any profit you may figure, as far as time, labor, and so forth, is concerned? A. That is correct. I stated it took me three hundred some odd days in which to complete this contract. Consequently, I based my labor and my overhead accordingly.

"Q. So the price of materials might have been stable but the question of delivery was very uncertain during this period. Is that right, sir? A. Well, it was uncertain this way: It was taking about twice as long to get it as it usually did.

"Q. Were you able to get delivery of everything, all at one time, so it didn't interrupt the continuity of your work, or were the deliveries irregular and broken into—broke into the continuity of your work? A. I will answer that question in this way: In the construction game you cannot take all your material at one time. You have to have a schedule for when you want it.

"Q. That is exactly right, so you figure to have this item delivered now and the next item going to be used in point of time to be delivered in correct sequence? A. That is correct.

"Q. Was the situation prevailing at this time such as it would have enabled you or any other contractor to set up and follow a material schedule like you formerly—you normally would like to do? A. Well, it was and it wasn't.

"Q. Well, I don't understand that, sir. Was it or was it not? A. Well, your suppliers would give you a delivery date. Whether they would have stood by it we don't know. An act of God or something

could have come in to prevent them making delivery.

"The Court: This delay of getting materials was not due to delivery; lack of transportation? A. No, sir.

"The Court: It must have been in a scarcity of materials. A. It would have been so, yes, sir.

"By Mr. Robert P. Breazeale: Q. There is still scarcity from the back war? A. Yes, sir."

The father of this witness and senior member of his firm testified in effect that he checked the figures of his son's estimate and found them satisfactory.

The only other witness was Simon W. Tudor of the Tudor partnership, successful bidder, who testified from certain figures taken from his original bid on this job, but omitted break-downs which he said might give some of his "secrets" to his competitors. He showed only the total amounts of labor and materials. On cross examination he was asked and answered questions as follows:

"Q. This is the gross figure to the right? A. That is right.

"Q. Which includes what? A. Total cost.

"Q. Of both labor and materials? A. That is right, and overhead.

"Q. Everything? A. Yes, supposed to. You don't know whether it is or not until you get finished. That is the reason they call us gamblers.

"Q. What profit did this computation show on that particular job?"

(Objection by appellant's counsel was finally overruled but in the colloquy between the counsel and the Court, the latter remarked, "Since Jones didn't get the job, how could he ever prove how much profit he made.") The witness was finally permitted to answer the question and stated that his estimated profit was $20,000.00.

Counsel for appellee then asked:

"Q. I think the contract shows and it is not disputed that it was 200 days. Do you remember whether the job was completed within that 200-day period? A. I wouldn't think it was for other reasons. We had two other jobs right by the side of it; so I don't think they did, because they asked us not to work at certain times because they was using the dining hall at the same time we was constructing it.

"Q. Who asked you not to work at certain times? A. Well the president or whoever is in charge asked us to work with them so they could feed the students. We did half of it, I remember, and let them use that half, the half that wasn't tearing out, and we put them in the other half and then finished up the other half. Then we caught them between terms. We would do special work where we couldn't get to it. Then during the close of summer school, we rushed in and put in the kitchen floor, I remember. Those were some of the conditions and you had to kinda work when you could get in there.

"Q. Can you state about how many times you were interrupted by requests made by the school? A. I wouldn't say we was interrupted; it was just a mutual agreement.

"Q. It was understood? A. Understood.

"Q. Can you estimate how much time you took in finishing this job? A. I don't remember just about how much time. We were a good long while. We had these other two jobs and we finished them up all about the same time. I would say approximately a year or less. I don't know. I didn't keep up with that end of it."

On further direct examination by appellee:

"Q. Now Mr. Tudor, you have stated that as a contractor you took

into account not only the market conditions prevailing as to the cost of labor and materials, but you also anticipated other factors during that period of time in which you would be working. What other factors did you take into account? A. Well, certain materials you might not be able to get and they would raise the price on you. Sometime you have a firm price. Sometime they don't guarantee it.

"Q. Also, some of your subcontractors prices were fixed before you started work? Is that correct? A. That is right.

"Q. Can you state whether or not you encountered during the period of construction any change in market conditions as to the cost of labor and materials that altered the soundness of your original estimates? A. Not too much.

"Q. Were there any material changes in the plans and specifications? A. They made some changes, yes. They changed some cold storage units. I remember they didn't think they was going to work satisfactorily and they made some changes in that.

"Q. Can you state about what those changes represented, say, in dollars and cents, in relationship to the whole cost involved? A. They were substantial changes. They were not too much. They didn't amount to a great deal, but there were changes made all through— certain things that they wanted added and a few things left out all through the job.

"Q. Did those changes involve any new units in labor and materials or did they merely involve either the elimination of units or the addition of units? A. They made a change in a unit, maybe.

"The Court: Did the changes result in an increase or decrease in the cost price of the job? A. I

think it ran a little bit more, Your Honor.

\* \* \* \* \* \*

"Q. Did the Tudor Construction Company make a profit on that job and if so what profit? (Objections and several questions and answers intervened and the question was then repeated and answered as indicated.)

"Q. Are you in position to state, based on your actual personal knowledge of the cost factors that were involved in this particular job, computed either independently or in relationship to the other three jobs, but so as to segregate separately the actual cost involved on this particular job, what profit, if any, you made on this particular job? A. *Well, I wouldn't be able so say. I know that we made a profit on the job, but I wouldn't say that whether it came from the other two jobs or this job.*

"Q. *It wouldn't be worth anything unless you are in position to testify as to what profits you made on this job?* A. *I am satisfied our estimate held up on that job.*

"Q. *You are satisfied that your estimate held up?* A. *We checked it that close. We kept it that much separated.*

"Q. *Your testimony is that you did keep it sufficiently well separated?* A. *We keep each job separate. Each job is charged out as a unit.*

"The Court: *Let me interrupt you. Do I understand that the fact that you had these other two jobs going on that you were able to use the same supervision, same office and some of the other workmen and that enabled you to make the profit which you say you did make? A. Yes. We made a profit all right on the job.*

"The Court: *But I say the fact that you were able to make that profit was based to some consider-*

*able extent on the fact that you say that you had these other jobs going on at the same time? A. Your Honor, I would say this: I might have lost money on the others. They might have switched over from one to the other; because when you take one superintendent and handle three jobs, you might lose your efficiency, but we did handle it with the same superintendent and the same timekeeper. Sometimes you can have so much under one superintendent that your efficiency ceases to be worthwhile and sometimes it is a good thing. It would be hard to say."* (Emphasis by the writer.)

It will be noted that the accepted bid of the Tudor Construction Company was $211,799.00, or $3,302.00 more than that of appellee had the deduction of $4,000.00 which he attempted in the telegram been made. Assuming Jones could have done the work as cheaply as Tudor, as to which there is no substantial proof, the former, in order to do so, would have had to take from his estimated profit of $23,610.77 the same $3,302.00, thereby reducing it to $20,308.77 instead of the $23,166.33 which the lower court allowed. While it is true that Tudor insisted that he made a profit on the job, it is apparent from his testimony that, although it had been finished several months before, the witness was not sure that he had made any profit, for his figures were mixed up with the two other jobs which he was carrying on at the same time as the remodeling of this dining room and kitchen, amounting all together to some three quarters of a million dollars.

It seems inevitable therefore that appellee's evidence to support its alleged loss amounts to nothing more than its original estimate with no clear proof of any loss of profit which was undoubtedly necessary before he could recover anything. In Guidry & Swayne v. Miller, 217 La. 935, 47 So.2d 721, the Supreme Court of Louisiana said:

"In action by contractor for breach of contract, amount of lost profits must be proved with reasonable certainty, and proof should not be theoretical and speculative. Civ. Code, art. 2765."

In the present case appellee's alleged profit can at best be nothing more than an estimate which involved uncertain and unknown factors and in reality amounts to speculation. When this is considered in connection with the fact that its message was sent at the cheapest rate provided on the form, which clearly advised him that by paying a little more he could have had the message repeated to avoid mistakes; and in view of the further fact that in spite of the importance of the message, which was not made known to the appellant, appellee did nothing to ascertain if it was timely delivered, a condition of the appellee's own making was created, which, from an equitable standpoint would seem to demand that it be held to a stricter interpretation of its rights than would have been required in a case where the loss was conclusively proven. It is common knowledge to the public that telegraph companies use immature persons for delivering messages, no doubt because the bulk of their business does not involve possible loss to its customers in the event of mistakes and delays. Where it provides a means of insuring correct transmissions, the handling of an important message such as was sent in this case in the manner which the appellee did, without following up to see that it was delivered, the telegraph company as stated having no knowledge of its importance, at least convicts the sender of some negligence, which, in a tort case would probably prevent its recovery.

It seems to be conceded that there is no Louisiana case exactly in point but several have been cited by either side as to the right to recover damages for prospective profits. Starting with the oldest first, Seaton v. Second Municipality of New Orleans, 3 La.Ann. 44, was one

in which the building contract was less than half completed when it was breached and the contractor sued for loss of profits and other damages, recovering a verdict of $38,000.00. The Louisiana Supreme Court reversed and remanded it and, in doing so, said:

"The damages in loss of profits allowed are based exclusively upon the loose and speculative opinions of the witnesses, and upon estimates of supposed profits. The plaintiff's counsel asked that the difference between the amount he was to receive and that which he was to pay, under the subcontracts he had made for the building and materials, constituted the profits. Evidence of that description would open too wide the door to fraud, to be received as full proof. How can it be ascertained, without any evidence as to the value of labor and materials at the time, or as to the solvency or subcontractors, whether they would have been able to comply with their obligations, or to indemnify the plaintiff if they had not?"

The Court then said that the way to determine the matter would be by ascertaining "the market value of the contract at the time of breach, whenever there is a market value, to govern, in the assessment of damages. There being no market value in this case, *the question of profits involves a minute inquiry into costs of materials, the expense of procuring and transporting them to the place of delivery, the amount of labor required for putting up the building and the value of the wages of laborers and mechanics, the whole to be assessed at the time of the breach of contract.* Even with these data the estimate of profits must be conjectural. But whereever this is the case, it is the province, as well as the duty of the jury, not to assess the damages rigorously; but on the contrary to moderate them, so as to make allowances for any uncertainties that may exist. The nature of the proof required in cases of this kind has been very thoroughly investigated by the Courts of New York. Masterson v. Mayor [etc.] of [City of] Brooklyn, 7 Hill [N.Y. 61], 62, 42 Am.Dec. 38 and other cases." (Emphasis by the writer.)

In Cusachs & Co. v. Sewerage & Water Board of New Orleans, 116 La. 510, 40 So. 855, the action was for loss of the plaintiff's business due to the fact that all of its securities had been put up for collateral to the bond given for the sewerage work which was undertaken. In another suit then pending, the plaintiff was seeking to recover his expenses and profit incurred under the contract which had been partially performed. In disposing of this case, 40 So. 855, the court denied a recovery, stating that such damages were too remote and affirmed the judgment of the lower court.

In Dugue v. Levy, 120 La. 369, 45 So. 280, cited by defendant, the case had previously been before the Supreme Court in 114 La. 21, 37 So. 995, in which the judgment of the lower court was set aside and the case remanded for further evidence. In the opinion remanding it, the court said, at page 999 of 37 So.:

"While the evidence in the case is exceedingly voluminous on the character of plaintiff's work and materials, it is astonishingly scant on the question of the exact amount of the loss suffered by plaintiff from the action of defendant."

Hart v. Tremont Lumber Company, 131 La. 847, 60 So. 368, was an action for a breach of contract to haul an estimated five million feet of timber from a designated tract of land. The stipulated price was $1.25 a thousand and about half of the timber had been hauled when the contract was terminated by the owner. Although the trial court found the testimony as to the expenses incurred for that part, approximately half of the timber, which had been hauled were disputed and the evidence was conflicting, it said the proof preponderated in support of the plaintiff's contention showing a profit of $2,250.00 which was affirmed

by the Supreme Court. In that case there was definite proof of the items of expense and a customary percentage of profit which the court could evaluate without relying on mere estimates or speculation and uncertainties, amounting to little more than the opinions of plaintiff's witnesses, as in the present case.

In Delarosa v. Misuruca, 172 La. 190, 133 So. 441, the Supreme Court did not discuss the nature of the evidence. It involved a contract for the erection of a moving picture theatre. There was considerable discussion of whether or not a valid contract had been entered into, due to proposals and counter-proposals, but since the owner had permitted Delarosa to proceed with the work, it was held that the contract had been accepted on his terms. He "immediately devoted himself to the preliminaries necessary to beginning of the work. A few days later the plaintiff learned that, prior to the filing of his bid, the defendants had called for bids for a smaller and less expensive building" and others had been awarded the contract therefor. It is stated in the opinion: "We have read the testimony carefully, and while we find it conflicting, the preponderance of the evidence establishes, with reasonable certainty, that the contract was actually awarded to the plaintiff * * *." Although the nature of the evidence to prove the profit was discussed, the court concluded:

"The trial judge found that plaintiff's profit was figured in the bid at 10 per cent. of the cost of the building, the sum of the profit being $2,881.36, for which amount, together with legal interest thereon from judicial demand, judgment was rendered in his favor.

"The testimony in the record sustains the correctness of the judgment, and it is therefore affirmed at appellants' cost."

Western Union Telegraph Company v. Campbell, 1904, 36 Tex.Civ.App. 276, 81 S.W. 580, 581, also cited by appellee, involved the failure of the telegraph company to deliver a message sent by a wife to her husband requesting that he meet her on arrival of a train at a station. She was compelled to walk a long distance to a hotel through rain and mud and having no night gown, slept in her wet underclothing, catching a cold. The jury gave a verdict for $200.00, but the appellate court reversed, saying: " * * for it does not appear from the evidence that, if the message had been promptly delivered to him, he (the husband) would have met his wife * * * or that, if he had * * * it would have been with a conveyance to save her from the walk through the mud".

In the present case, of course, the appellee offered proof to show that had the telegram reducing his bid by $4,000.00 been delivered by 10:00 o'clock, it would have been considered, but the cited case is quite pertinent to the legal point that, in addition, substantial proof to support the claims of lost profits or damages is necessary.

The case of Pfiester v. Western Union Telegraph Company, 1917, 282 Ill. 69, 118 N.E. 407, also cited by the appellee, was one where there was a failure to deliver the message but when taken with one the addressee had sent, to which the undelivered telegram was a reply, showed that the former would have had employment for the baseball season of 1912, if the jury believed his statement that he would have accepted the offer of $300.00 a month in place of his own proposition of $3,000.00 for the entire season. He so testified and this case involved merely the credibility of the plaintiff which the Court said was a jury question as it was shown he had no employment during that baseball season.

In addition to the case Guidry & Swayne v. Miller, supra, appellant has cited Gebelin v. Hamilton, 18 La.Ann. 646, which was one involving a contract for the delivery at a point on the river bank of 100,000 staves at so much per thousand. A disagreement having arisen after something less than fifty percent had been delivered, the plaintiff sued for those which had been shipped.

**488**

Defendant reconvened or filed a cross-complaint for damages and profits for staves not delivered. In passing upon the matter, the Louisiana Supreme Court said:

"To be deprived of the prospect of gain can hardly be said to be positive loss. The realization of the expected profit was to be a thing of the future, that is, a consummation which might never have taken place. The contemplated gain was contingent and not a thing absolute and certain. A fall in the price * * might have happened before the purchasers could have disposed of the quantity contracted for. Many events might have occurred to lessen their profits, and even to produce loss. Where facts are shown that leave no reasonable doubt that one of the parties to a contract has really suffered loss and injury, resulting from failure of the other to comply with his part of the obligation the probable profit or gain, which the injured party would have derived from the contract, would be a fair measure of the damages sustained. But where, as in the present case, no reasonable grounds are shown that a real injury has been suffered, we think that damages should not be allowed."

If this case had been tried to a jury, the lower court would have been compelled to direct a verdict for appellant, for the reason there was no concrete proof of loss of profit upon which it could stand. The record tends to establish that no better case could be proven by remanding it. The judgment is therefore reversed for further proceedings consistent with this opinion.

RUSSELL, Circuit Judge.

I concur in the judgment of reversal.

On Petition for Rehearing

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

PER CURIAM:

The motion for rehearing is refused and the case is remanded with instructions to enter judgment for the defendant.