480 So.2d 1013 (1985)
CRESCENT COATING COMPANY, INC., Through its President, Patsy KNIGHT
v.
Joseph BERGHMAN.
No. 85-CA-371.
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 1985.
Rehearing Denied January 17, 1986.
*1014 Joseph Neves Marcal, III, New Orleans, for Crescent Coating Co., plaintiff-appellant.
Ronald P. Thibodeaux, Duplechin & Associates, Gretna, for Joseph Berghman, defendant-appellee.
Before BOUTALL, CHEHARDY and CURRAULT, JJ.
CHEHARDY, Judge.
This is a suit for $1,027.62 for services rendered and materials furnished under an oral building contract between plaintiff, Crescent Coating Company, Inc., and defendant, Joseph Berghman, an owner of the property.
Berghman answered in the form of a general denial and reconvened for damages for remedial work allegedly necessitated by plaintiff's unworkmanlike performance. Following trial on the merits judgment was rendered dismissing plaintiff's claim on the main demand and in favor of Berghman in the sum of $9,460 on the reconventional demand. Plaintiff has appealed.
To clarify this complex dispute, a detailed recital of facts is necessary; we will attempt to reconstruct the matter in chronological *1015 order since the parties differ in their interpretation of almost all of the facts.
Mr. and Mrs. Berghman own the property in suit in Terrytown, Louisiana. In 1981 the Berghmans decided to make certain improvements on their home consisting of construction of a driveway and enclosing a patio at the rear of the property. In August 1981 the Berghmans secured the necessary parish building permit for this work. The "owner" was listed as the contractor on the permit.
The driveway was constructed by Mr. Berghman, but the enclosure of the patio was a more complicated problem and Berghman sought estimates from various contractors. He was interested in quality work at the cheapest price. One of the companies which Berghman called was Crescent Coating Company, Inc. Mrs. Patsy Knight is president of the corporation and handles the bookkeeping duties and Frank F. Knight, Sr., her husband, is the company manager and estimator.
The Knights were just starting their business and the Berghmans appear to have been one of their first customers. The company ran an ad in the newspaper to do waterproofing, caulking, exterior painting and masonry repairs. According to Mr. Knight during this period he received a telephone call from Berghman asking if masonry repairs included laying a small brick wall.
Berghman admits he phoned Knight, but denies it was in response to the ad. He claims he never reads the newspapers and that he called Knight upon the recommendation of others. He knew he was dealing with a corporation, but at all times believed Knight was a general contractor.
Knight denies he ever represented himself as a general contractor, but he has a subcontractor's license. As a waterproofer he was closely associated with the brick laying trade and knew a professional bricklayer who could do that part of the job. Knight is used to working from plans and specifications and has 20 years of experience.
Following the phone conversation Knight went to see the patio. It was a standard 12-by-24-foot concrete patio adjacent to the back wall of the house. The Berghmans had no formal blueprints, plans or specifications. They wanted the room to have five floor-to-ceiling windows separated from each other by brick columns, a brick fireplace in the center of the room, and a back door.
Knight told them windows to the floor were impractical and dangerous when mowing a lawn, that a brick fireplace would be too heavy for the foundation without pilings, and that brick columns would take up 8 inches of space, leaving a very small room. He suggested starting the windows 18 inches above the floor, substituting a metal heatilator for the brick fireplace and enlarging the area by removing the existing slab and laying a larger one.
The Berghmans accepted all of the suggestions except that of removing the old slab. They did not want to build a new slab because it was too expensive. It is very clear from the record that money was uppermost in their thoughts in all areas of this construction.
Knight claims he then suggested repairing a crack in the existing slab, topping the slab with 2 inches of epoxy and extending it, but Berghman was concerned that there might not be enough headroom with the addition of 2 inches to the slab.[1]
Berghman then asked if they could add to the existing slab and Knight indicated he could add a 10-inch-by-10-inch footing and connect it with the existing slab and put the brick wall up from the footing.
We conclude from the testimony that the parties agreed to the footing and the brickwork as above described and that the work was to begin the following Monday.
*1016 Berghman was to supply the cement and plaintiff was to supply all other materials including the forms and bricks, make the concrete and supply two workmen to do the job. The work was to take one week. The footing was to be tied into the existing slab and the walls where necessary were to be joined onto the existing house. Plaintiff contends the price was to be $2,500, and defendant's understanding of the agreement was that the cost would run between $2,000 to $2,300.[2]
Plaintiff was responsible only for building the footing and the brick wall. It was not called upon to provide or install the windows, the door or the roof, as Mr. Berghman was doing as much as he could himself or with the help of friends.
In an effort to speed up the work, before the men were to arrive that Monday, Berghman tilled the soil around the slab and dug out the area where the addition to their existing slab was to be poured. This was not his responsibility and it was certainly not discussed or contemplated by the contract.
For reasons unexplained in the record, no one arrived to work on Monday. On Tuesday afternoon four men arrived and spent three hours making and laying the wooden forms to receive the concrete. The forms were placed in the trench dug by Mr. Berghman. It is unclear how deep the trench was. Berghman says he merely ran the tiller around the outside perimeter of the existing slab to make it easier for the crew to pour the concrete and that it was not intended to be a finished product.
However one of the workmen said the trench was deep, another described it as small, and Mrs. Berghman in a letter to the Better Business Bureau shortly after the footing was completed, and after defendant had received a bill, stated the bill was excessive because her husband had done 50% of the work.
Mrs. Berghman started to keep accurate records of the work done and the hours spent when four men arrived on Tuesday, presumably because of a possible increase in the cost of the job, since the contract called for only two men.
On Wednesday the men returned and spent seven hours mixing the 40 or 50 bags of cement supplied by her husband in a wheelbarrow to make and pour the concrete. She did not consider this professional as she expected the concrete to be made in a truck.
On Thursday the slab was drying and on Friday it rained. This lack of progress on the job was distressing to the Berghmans as they expected the work to be completed within a week. Mr. Berghman had arranged to take his vacation that week to be available if needed, according to him, but according to plaintiff, to supervise the job. Mr. Knight came by occasionally to check his workers' progress throughout the week, and Mr. and Mrs. Berghman were present at all times.
A problem arose about the bricks. They had been ordered and paid for by plaintiff but had not been delivered to defendant's residence. The bricks were at the brickyard on Friday when Knight and defendant went to see about the delay, and defendant offered to get his own truck and take the bricks, but the dealer assured the men the bricks would be delivered without fail the next day (Saturday).
The bricklayer and a helper arrived at 8 a.m. on Saturday, but the bricks had not arrived. He says they did no work on that day, but Mrs. Berghman said the bricklayer "popped a crooked chalk line" for the bricks.
At 10 a.m. when the bricks had not arrived, Mr. Berghman fired the men and told them to go home. He then phoned *1017 Knight, told him the contract was at an end and asked him not to return. No further work was ever done on the contract by plaintiff. A bill for $1,027.62 was subsequently sent to defendant for the materials and labor for the work performed.
Mrs. Berghman was shocked at the size of the bill, because the men had worked only ten hours and her husband had supplied all of the "concrete". It is our understanding that cement, when mixed with sand, gravel and water in the proper proportions becomes concrete (see Fortier v. Sessum, 441 So.2d 1238-1240). Consequently while Berghman provided the bags of cement it was plaintiff's workmen who made and poured the concrete. Mrs. Berghman also complained because the footing was not straight.
Defendant never paid any of the bill. He engaged another bricklayer who built the wall, and he and a friend put on the roof. Berghman also added another small slab outside the backdoor. He poured this himself. It was not contemplated in the oral contract with plaintiff.
The record fails to establish that the new bricklayer followed the same oral plans determined by plaintiff and defendant. In fact it would appear that some change was made, as pictures depicting the addition show a small octagon window in the brick wall which does not correspond with long windows beginning 18 inches from the footing discussed in the original oral agreement.
On April 16, 1984, two and one-half years after the work had been performed, plaintiff sued defendant for payment. Defendant reconvened for damages alleging failure to perform the contract in a workmanlike manner. It is alleged that the work was done improperly, resulting in substantial damages, that the specifications were not followed, and that no pilings were used, causing the slab to sink, which in turn caused the brick wall to crack.
In support of his claim defendant relies on the testimony of the parish building inspector John Marks, who visited the residence and saw the addition. He stated it was only about the size of a carport  280 square feet  and that the parish does not require any drawing on such additions or take any action where such small enclosures are in question.
He stated the addition was not in compliance with the parish ordinance because unless it was at least 16 by 24 inches, which of course it was not, it should have been on pilings.
The defects complained of are that the slab is sinking and there are cracks in the slab and the bricks. Berghman testified he fired plaintiff because the slab was not straight and true, the fireplace was not centered, and he did not like the work. He therefore hired someone else to complete the job.
Harold Magee, a general contractor, was called as an expert by the Berghmans. He visited the home and found a crack in the slab. He determined that the patio and chain wall had settled. He measured the footing and found it to be 8 inches to 10 inches in depth, but was unable to determine the width.
He knew the depth in that area should have been 24 inches to support a brick wall and had he been doing the job he also would have used pilings. He was unable to state with certainty that all of the cracks were caused subsequent to the addition because cracks can be caused by shrinkage, compression, differences in temperature or vibrations. However he concluded the cracks here were caused by the weight of the chain wall 8 to 9 feet high bearing on the footing.
He submitted a written proposal to furnish all material and labor to shore up the roof, remove the three existing walls and entire foundation, and replace the same using whatever material could be salvaged for the new construction. He would install a new 4-inch-thick concrete slab with grade beam, and support the slab with treated Class 9 pilings driven to grade. He would replace the brick walls using salvageable bricks and install the existing windows and *1018 door with necessary trim and molding for $8,290.
A landscape architect was called to estimate the cost of removing and replacing plants and trees which would be affected while the rebuilding was taking place. Her cost estimate was $1,171.68.
As stated above, the trial court dismissed plaintiff's suit on the main demand and granted judgment in favor of intervenor for $9,460.
In this court appellant contends the trial court erred (1) in failing to award it compensation for the work performed, and (2) in holding it responsible for faulty work performed by others.
This case is complicated by the fact that plaintiff was discharged prior to completion of the contract and that most of the work which it would have otherwise performed was done by another bricklayer.
LSA-C.C. art. 2765 provides:
"The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require."
Our courts have consistently held this rule sufficiently broad to cover the loss of profits. As stated in Dugue v. Levy, 114 La. 21, 37 So. 995 (1904), our Supreme Court said:
"The proprietor, on the one hand, shall have the legal right to put an end to the contract, and the contractor, on the other hand, shall be placed in as good a position as he would have been if he had been permitted to complete the contract." Id. at 999.
The owner's liability is limited to quantum meruit for labor and materials plus profits the contractor would have realized and is measured by the balance payable under the contract less the amount necessary for the contractor to complete the work. Roland v. American Casualty Co., 227 La. 727, 80 So.2d 387 (1955); Kinchen v. Gilworth, 454 So.2d 1130 (La.App. 4th Cir.1984).
Where the owner cancelled for cause Article 2765 would not apply and the contractor would not be able to recover for lost profits. Here defendant alleges he cancelled for cause because the cement work was not done when it was supposed to be done, the specifications were not followed and no pilings were used.
It is clear the work was to be performed within a week and plaintiff was discharged within five days, furthermore there were no formal plans and specifications supplied by either party, a fact well known to defendant, and plaintiff was not discharged for failing to lay pilings, because no pilings were contemplated under the contract.
Defendant and his wife both state they asked if pilings were necessary and were told they were not by plaintiff, while plaintiff claims defendant did not want to pay for pilings.
We now know that under the parish ordinances pilings or a 16-by-24-inch foundation should have been used, but the owner was the person who secured the building permit which clearly states, "I certify that the construction or reconstruction for which this permit is issued will be done in accordance with the Building Code Ordinance 2225 and ordinances governing construction and reconstruction of buildings in the Parish of Jefferson."
Therefore, while defendant claims plaintiff should have known of the parish requirements and so informed him, it appears that defendant having secured the permit himself, and listing himself as contractor, should also have been aware of the parish requirements.
While the contractor may have been prevented from completing the contract, nevertheless the work which he did perform must be completed in a good workmanlike manner free from defects in material or workmanship. LSA-C.C. art. 2769; Fortier v. Sessums, supra.
*1019 Where the construction is so defective that it would be useless, the loss sustained is the price paid for the construction of the thing, plus the removal thereof, and the cost of restoring the premises to its former condition. Ilgenfritz v. Radalec, Inc., 226 La. 59, 74 So.2d 903 (1954); Trahan v. Broussard, 399 So.2d 782 (La.App. 3d Cir.1981).
It was manifestly erroneous for the trial court to fix defendant's damages at what it would cost to replace the existing structure with a completely new room to designs and specifications not initially contemplated and with substantially more expensive materials. This would place defendant in an improved position to which he is not entitled. He would only be entitled to be returned to the condition he was in prior to the contract. Trahan v. Broussard, supra; Fortier v. Sessums, supra; Stream v. LeJeune, 352 So.2d 714 (La.App. 3d Cir.1977); Greer v. Rohrer, 346 So.2d 1290 (La.App. 3d Cir.1977).
However the evidence does not convince us that the room was unfit for the purpose for which it was intended. Defendant and his family used the room without complaint for two and one-half years and found fault with the project only after they were sued. We are of the opinion that defendant has utilized plaintiff's work, that it is not so defective as to be utterly useless and that plaintiff is entitled to be paid.
Mrs. Knight, the bookkeeper, testified in detail as to the manner in which the bill was prepared, itemizing the cost of labor and materials and mark-up. The bill appears to be reasonable for the work performed, on a quantum meruit basis.
For the reasons assigned the judgment appealed from is reversed and it is now ordered that there be judgment in favor of plaintiff, Crescent Coating Company, Inc., and against defendant, Joseph Berghman, in the sum of $1,027.62. The judgment on the reconventional demand is reversed and all costs in both courts are to be paid by defendant.
REVERSED AND RENDERED.
NOTES
[1] Berghman does not recall this suggestion and denies there was a crack in the slab. Mrs. Berghman admitted there was a crack in the slab but described it as a hairline crack that could hardly be seen, while Knight described the crack as large as ¼ inch in one area.
[2] By letter dated October 19, 1981 but received at a disputed later date, Knight wrote Berghman "confirming the [oral] agreement". The letter quotes the price as $2,500. No mention was made of the fireplace or the obligation of Berghman to supply the concrete. Since Knight in his testimony indicated the oral contract did cover those areas and other matters not discussed in the "confirmation", the letter does not accurately cover the more detailed oral agreement testified to by both participants.