**TEXSUN FEED YARDS, INC., Plaintiff-Appellee-Cross Appellant,**

v.

**RALSTON PURINA COMPANY, Defendant-Appellant-Cross Appellee.**

**No. 30145.**

United States Court of Appeals, Fifth Circuit.

July 6, 1971.

Rehearing Denied and Rehearing En Banc Denied Aug. 27, 1971.

---

Thomas W. Hathaway, Johnson, Hathaway & Jackson, Tyler, Tex., for defendant-appellant.

Ernest Langley, Witherspoon, Aikin, Thomas & Langley, Hereford, Tex., for plaintiff-appellee.

Before COLEMAN, SIMPSON and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Texsun Feed Yards, Incorporated, (Texsun), a Texas corporation, a feed lot operator of Hereford, Texas, brought this suit against the Ralston Purina Company (Ralston), a Missouri corporation doing business in Texas, in the district court seeking damages for negligence, breach of warranty, and strict products liability in connection with Ralston's

sales of feed supplement to Texsun during the spring of 1967. The jury awarded Texsun $27,000 as compensation for refunds, rebates, and adjustments which Texsun made to its customers and $10,-000 as compensation for Texsun's loss of profits and diminished business reputation. The trial judge set aside the $10,-000 award and entered judgment for $27,000 for Texsun, 311 F.Supp. 644. The case comes to us on Ralston's appeal and Texsun's cross-appeal with respect to the setting aside of the $10,000 award for lost profits and loss of business reputation. For the reasons which follow, we affirm the $27,000 judgment in Texsun's favor and reverse with respect to the cross-appeal, reinstating the $10,000 award set aside by the lower court.

A feed lot sells livestock feed and services to its customers, who own the cattle on the lot. The cattle are brought to the yard by the customers and placed in the care and custody of the feed lot operator. The operator prepares and feeds to the cattle a ration designed to top the cattle off to slaughter weight and quality in the shortest time possible for the least cost per pound of gain. Except for veterinary services, the other usual services rendered by the feed lot to the customer are furnished as an incident to the feeding operation, the value of such services being included within the price of feeding. When the beef animals reach the desired finish weight, or at such other times as the customer may elect, he removes his cattle from the feed yard and pays his feed bill.

Rations fed to cattle by feed lot operators are scientifically designed combinations of feed grains, roughage, and additives. These additives include such items as medicines, vitamins, hormones, protein concentrates, and other substances designed to assist in putting on the most additional weight for the least cost. Ralston Purina Company and like organizations customarily furnish the additives to feed yards as a "package", known in the trade as the "ration supplement".

As noted, the common objective of feed lot operators and their customers is to create circumstances under which the cattle gain weight as quickly as possible. This is achieved by inducing the beef animals to consume feed at an increased rate. While leading of course to higher feed lot bills to the cattle owner, the increased consumption also reduces the time necessary for the cattle to attain the desired weight, getting the cattle ready for market faster. The ration supplement is designed to induce the cattle to consume feed at a higher than normal rate.

The Ralston Purina Company manufactures and distributes various kinds of additives, supplements, and other chemical and nutritional elements for livestock feed. As an aid to customers and as an inducement to increased sales, Ralston and its competitors offer the services of staff expert animal nutritionists, who advise feed lot operators as to the proper type of ration supplements, how to use them and in what quantities and what combinations with other feeding elements so as to provide the most efficient total ration. All these activities are focused on helping lot operators add the maximum additional weight to the animals being fed at the lowest possible cost. Since the basic ingredients of the ration: hay, grain, silage and like components are normally deficient in many of the elements required for the most efficient nutrition, the function of the ration supplement is to make up for these deficiencies. It is thus the most important part of the ration.

For a substantial period of time prior to March 1967, Texsun purchased ration supplements from Ralston and availed itself of the services of Ralston's nutrition consultants. Ralston during this time represented that its ration supplements were appropriate for the intended purpose and Texsun relied upon Ralston and its staff nutritionists with respect to the design and mix of the rations fed by Texsun to its customers' cattle.

In March 1967, Texsun began to purchase a different ration supplement from Ralston. Ralston's assigned nutrition consultant, Dr. Mel Karr, advised Texsun to feed the new ration supplement to the cattle in Texsun's yard at the rate of 1.5 pounds per head per day. Texsun followed Dr. Karr's instructions, with disappointing results. It was subsequently determined that Dr. Karr should have told Texsun to supply the ration supplement to the cattle at the rate of 2 pounds per head per day.

Soon after Texsun began feeding the new ration supplement at the rate of 1.5 pounds per head per day, the rate of weight gain of the cattle in the yard decreased. To compensate for this diminished rate of gain, Texsun kept many of its customers' animals in the yard longer than usual to attain the desired gain in weight. This additional time in Texsun's yard resulted in higher costs per pound of gain. Some of Texsun's customers removed their cattle from Texsun's yards because they were dissatisfied with the rate of gain. Texsun's customers demanded that Texsun extend cash refunds and account adjustments to compensate them for the additional feeding periods required to bring the cattle up to the desired marketing weight. In the spring of 1967 Texsun made cash refunds, rebates, and adjustments to its customers in an aggregate of $35,858.22.

For the fiscal years ending September 30, Texsun compiled the following financial history:

| Year | Cattle Capacity | Sales | Profit (Loss) |
|------|------|------|------|
| 1966 | 3,000 | $700,000.00 | $ 1,350.72 |
| 1967 | 5,000 | $800,000.00 | ($18,778.97) |
| 1968 | 5,000 | $600,000.00 | ($16,044.23) |
| 1969 | | | $ 35,000.00 |

### Texsun's Complaint

Texsun alleged in its complaint that the ration supplement supplied by Ralston was defective and that the defect in the supplement proximately caused Texsun to suffer economic losses. In addition to feeding an insufficient amount under Ralston's recommendations, the defect in the supplement claimed by Texsun was characterized in two ways: (1) there was some deficiency in the ration supplement of a nature known only to Ralston, or (2) the manner in which the ration supplement interacted with the other feed that Texsun was using led to a weight gain rate below acceptable levels. As the case developed, the latter theory emerged as the mainstay of Texsun's case.

### Ralston's Answer

Ralston sought to defend itself on several grounds. It denied that any warranty, express or implied, was ever given or inferred to Texsun with respect to the results that would be obtained from the use of the ration supplement; it denied that Texsun had relied upon the services and products furnished to Texsun by Ralston; it alleged that in some particulars Texsun had acted contrary to the instructions and advice of Ralston's staff nutritionist; it denied that the ration supplement was in any way defective; and it denied any responsibility for any of Texsun's alleged losses, costs, or expenses. As affirmative defenses, Ralston asserted that Texsun had been contributorily negligent in failing to utilize steam flaking process and equipment, in failing to exercise good management practices in order to prevent unusual and unreasonable wastage of feed and ration supplement, and in failing to follow the instructions and advice of Ralston's nutritionist; that Texsun had voluntarily made refunds and rebates to its customers, thereby insulating Ralston from liability for such losses; and that Texsun's claim for lost profits was so vague, uncertain, and speculative as to be wholly unrecoverable under Texas law.

### Verdict and Judgment

At the close of all the evidence, Special Interrogatories (referred to below, following the Texas practice, as "special issues") were propounded to the jury. Because apparent inconsistencies in the

answers of the jury constitute critical aspects of this appeal, we have set out in the margin the complete text of the questions and answers.[1]

1. Special Issue No. 1

Do you find from a preponderance of the evidence that the Plaintiff suffered or incurred any damages or losses because it fed and used the Defendant's ration supplement in feeding its customers' cattle in February, March, April and May of 1967?

Answer "Yes" or "No."

ANSWER: Yes.

If you have answered Special Issue No. 1 "Yes" you will answer the following special issues, otherwise you will cease your deliberations and not answer the following.

Special Issue No. 2

(a) Do you find from a preponderance of the evidence that the ration supplement furnished to the Plaintiff and prepared by the Defendant in the spring of 1967 was not suitable and reasonably fit for the purposes for which it was intended to be used at the time the ration supplement left the care, custody, and control of the Defendant?

Answer "It was not reasonably fit" or "It was reasonably fit".

ANSWER: It was not reasonably fit.

(b) Do you find from a preponderance of the evidence that such unfitness, if any you have so found in the preceding special issue, was a producing cause of the damages or losses, if any, and about which the Plaintiff complains?

Answer "It was" or "It was not".

ANSWER: It was.

(c) Do you find from a preponderance of the evidence that the ration supplement in question was fed to the cattle by Texsun Feed Yards, or its predecessor corporation, without any substantial change in its condition from the time it left the possession, care, and control of the Defendant?

Answer "There was not a substantial change" or "There was a substantial change".

ANSWER: There was not a substantial change.

(e) Do you find from a preponderance of the evidence that the Plaintiff, Texsun Feedyards, Inc., and its predecessor corporation, during the period in question, used the ration supplement as it was intended to be used and/or as the Defendant instructed it to be used?

Answer "Yes" or "No".

ANSWER: Yes.

Special Issue No. 3

(a) Do you find from a preponderance of the evidence that the Defendant failed to give the Plaintiff proper instructions as to the percentage of the ration supplement that was to be mixed with the feed being fed to the cattle belonging to the Plaintiff's customers in the spring of 1967?

Answer "Yes" or "No".

ANSWER: Yes.

(b) Do you find from a preponderance of the evidence that the failure to give such proper instruction, if you have found such failure, was negligence and a proximate cause of the damages or losses, if any, and about which the Plaintiff complains?

Answer "Yes" or "No".

ANSWER: Yes.

Special Issue No. 4

(a) Do you find from a preponderance of the evidence that the ration supplement prepared by the Defendant and fed by the Plaintiff to cattle belonging to its customers in the spring of 1967 did not contain the proper mixture or proportion of its essential ingredients?

Answer "It did not contain the proper mixture" or "It did contain the proper mixture".

ANSWER: It did not contain the proper mixture.

(b) Do you find from a preponderance of the evidence that the failure to contain the proper mix or proposition of essential ingredients in the ration supplement prepared by the Defendant (if you have found such failure) was negligence and a proximate cause of the damages or losses, if any, and about which the Plaintiff complains?

Answer "Yes" or "No".

ANSWER: Yes.

Special Issue No. 5

What sum of money if paid now in cash do you find from a preponderance of the evidence would fairly and reasonably compensate the Plaintiff for its damages or losses, if any, it may have suffered or incurred because it fed and used the Defendant's ration supplement in its cattle feeding operation during February, March, April, and May of 1967?

Answer in dollars and cents or "None".

ANSWER: 27,000.00.

Special Issue No. 6

(a) Do you find from a preponderance of the evidence that the Plaintiff suffered any loss of profits or damage to its business reputation because of the use of the Defendant's ration supplement in the spring of 1967?

Answer "Yes" or "No".

ANSWER: Yes.

After the verdict was returned, Texsun moved for judgment on the verdict and Ralston moved for judgment notwithstanding the verdict. The district court then filed a memorandum opinion [2] in which he upheld the jury's award of $27,000.00 and set aside the award of $10,000.00 for lost profits as being without support in the evidence.

*Issues Raised on Appeal*

On this appeal, Ralston urges reversal of the $27,000.00 award for the following reasons:

1. Texsun was required first to seek judicial ascertainment of its liability to its customers as a condition precedent to the bringing of suit to recover damages for the amount of refunds, rebates, or allowances voluntarily made to such customers.

2. The jury's finding of contributory negligence on the part of Texsun bars recovery by Texsun under the doctrine of strict products liability. (Answers to Special Issues 8(a) and 8(b).)

3. The jury's finding of contributory negligence on the part of Texsun bars Texsun's recovery for breach of warranty for a particular purpose as provided by Section 2.315 of the Texas Uniform Commercial Code, V.T.C.A. (Also based upon the answers of the jury to Special Issues 8(a) and 8(b).)

4. There was insufficient evidence to support the findings of the jury in response to Special Issue No. 2; even if there was sufficient evidence, the findings do not justify a recovery for Texsun based upon strict liability and/or breach of warranty.

On its cross appeal, Texsun contends that the district court erred in setting aside the jury's award of $10,000.00 for lost profits and diminished business reputation.

*The Indemnity Issue*

■ In its brief here Ralston asserts that:

" * * * appellant contends that while Plaintiff describes its suit as one for damages, in truth and in fact the same is a suit for indemnity and that under the Texas Rule, Plaintiff was required to first seek judicial ascertainment of its liability before Defendant could be held liable as the indemnitor". Appellant's Brief, page 7.

The district court refused to accept Ralston's characterization of Texsun's lawsuit:

"Defendant also asserts that Plaintiff has attempted to disguise the true nature of this case, indemnity, by bringing it under other theories of recovery. The Court agrees with Plaintiff's response that, under the facts as found by the jury, the Plaintiff suffered a

If you have answered Special Issue No. 6(a) "Yes" then answer part (b); otherwise do not answer part (b).

(b) What sum of money if paid now in cash do you find will fairly and reasonably compensate the plaintiff for the damages incurred by it as a result of the loss of profits or damage to its business reputation, if you have so found, and because of the use of the defective ration supplement furnished to Plaintiff and manufactured by the Defendant?

Answer in dollars and cents or "None".
ANSWER: 10,000.00 Ten Thousand.
Special Issue No. 7
(a) Do you find from a preponderance of the evidence that the plaintiff failed to follow the instructions as to the ration supplement designed by Dr. Karr?
Answer "Yes" or "No".
ANSWER: No

Special Issue No. 8
(a) Do you find from a preponderance of the evidence that the Plaintiff, in the spring of 1967, engaged in feeding and management practices at its feed yard that adversely affected the rate of consumption of feed by the cattle?
Answer "Yes" or "No".
ANSWER: Yes.
(b) Do you find from a preponderance of the evidence that such feeding and management practices of the Plaintiff constituted negligence and a proximate cause of the damages or losses, if any, about which Plaintiff complains?
Answer "Yes" or "No".
ANSWER: Yes.

2. The district court's opinion is reported at 311 F.Supp. 644 (N.D.Texas, 1970).

financial loss because of the use of Defendant's product and that while suit in the nature of indemnity may arguably be possible it is certainly not the exclusive route to recovery. The Court's instruction to the jury in relation to the damage Special Issues required a factual finding that the losses here in question were losses that the Plaintiff justifiably and reasonably sustained because of the use of Defendant's product. Plaintiff has not chosen an indemnity cause of action and it is this Court's opinion that such a choice is not required". 311 F.Supp. at page 648.

For the reasons given by the district court in its opinion, we agree that Ralston's attempt to treat this claim as one for indemnity is without merit.

*The Products Liability Issues*

A. *Negligence*

In response to Special Issue No. 8, the jury found that Texsun engaged in feeding and management practices at its feed yard in the spring of 1967, that adversely affected the rate of consumption of feed by the cattle entrusted to Texsun's care. In addition, the jury found that such feeding and management practices constituted negligence and a proximate cause of the damages or losses about which Texsun complained.

Both parties to this appeal agree that the jury's findings under Special Issue No. 8 as to contributory negligence eliminated Texsun's negligence claim from the case. Texsun's right to prevail, therefore, depends upon successful defense of the district court's conclusions either as to breach of warranty or upon the strict products liability theory.

B. *Strict Products Liability*

◼︎ Section 402A of the Restatement of the Law of Torts, Second Edition,[3] reads as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The Supreme Court of Texas embraced Section 402A of the Restatement of Torts in McKisson v. Sales Affiliates, Inc., Texas Supreme Court 1967, 416 S. W.2d 787.

While the lower court made no explicit reference to Section 402A in its memorandum opinion, it did characterize Texsun's complaint as alleging causes of action in strict liability and breach of warranty. The *McKisson* ruling was cited in its discussion of Texsun's contributory negligence.

We are of the opinion that Section 402A is not applicable to the facts of this case because the alleged defect in the ration supplement did not render the supplement "unreasonably dangerous" to the livestock in Texsun's yard. The most that can be said is that the alleged defect caused the ration supplement to be *less effective* than anticipated with respect to enhancing the rate of weight gain of the cattle entrusted to Texsun's care.[4] We

---

3. Restatement of the Law of Torts, Second Edition, page 348.

4. Frumer and Friedman, in their treatise *Products Liability*, note:

"There is substantial authority that the manufacturer must give both adequate directions for use and adequate warning of potential danger. Directions and warn-

conclude that it is unnecessary to determine whether strict products liability is an appropriate vehicle for Texsun's recovery in this matter, where the product is not claimed to be dangerous, but only ineffective. Therefore, we will omit discussion of Ralston's contention that Texsun's strict products liability claim was nullified by the jury finding of contributory negligence, as set out by the answer to Special Issue No. 8.

### C. *Breach of Warranty*

■ The following provisions of the Texas Uniform Commercial Code (Vernon's Texas Code Annotated, Business and Commerce, Volume I, V.C.C.) were in effect when Texsun purchased the ration supplement involved here:

(1) § 2.314 Implied Warranty: Merchantability, Usage of Trade

(a) Unless excluded or modified (Section 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(b) Goods to be merchantable must be at least such as

(1) pass without objection in the trade under the contract description; and

(2) in the case of fungible goods, are of fair average quality within the description; and

(3) are fit for the ordinary purpose for which such goods are used; and

(4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(5) are adequately contained, packaged, and labeled as the agreement may require; and

(6) conform to the promises or affirmations of fact made on the container or label if any.

(c) Unless excluded or modified (Section 2.316) other implied warranties may arise from course of dealing or usage of trade.

(2) § 2.315 Implied Warranty; Fitness for Particular Purpose

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Ralston, in an effort to avoid liability for breach of implied warranty of merchantability or fitness for a particular purpose, characterizes its dealings with Texsun in the following manner:

"Appellant submits that in essence here, the Defendant furnished a professional service to the Plaintiff and in connection therewith also manufactured and sold a specially formulated product consisting of the ration supplement in question. That the evidence viewed as a whole establishes that the product sold was not defective, there being no evidence whatsoever to indicate this fact, but that the professional advice of Dr. Karr to feed the supplement at the rate of 1½ pounds per day was incorrect, which conduct the jury likewise found to constitute negligence. The Trial Court perceived after the trial had progressed to a certain point that what was involved was a question of erroneous professional advice or instructions rather than defective product. * * * " (Appellant's Brief, pages 34–35).

We believe that Ralston's attempt to bring this case within the rule announced in Barbee v. Rogers, Tex.Sup.

---

ings serve different purposes. Directions are required to assure *effective* use, warn-

ings to assure *safe* use." § 8.05(1), page 162.

Ct.1968, 425 S.W.2d 342,[5] must fail. Ralston was in the business of selling ration supplement to feed lot operators. Its assignment of nutrition consultants such as Dr. Karr was designed to promote increased sales and to cultivate the good will of potential and existing customers. It is commercially unrealistic to treat separately the sale of the ration supplement and the rendering of professional advice and assistance. If Texsun was given inaccurate instructions by Ralston's nutrition consultant and if Texsun relied on those instructions to its economic detriment, we can perceive no reason for preventing Texsun's recovery under a breach of warranty theory.

*The Consequential Damages Issue*

■ In its brief, Ralston argues at great length that consequential damages of an economic nature are not recoverable in an action based upon strict products liability. Because we do not decide whether Section 402A of the Restatement of Torts is applicable here, it is unnecessary to deal with this contention.

At the time of the transactions in question, however, the following sections of the Texas Uniform Commercial Code (Vernon's Texas Code Annotated, Business and Commerce, Vol. I. U.C.C.) were in effect:

(1) § 2.714 Buyer's Damages for Breach in Regard to Accepted Goods

(a) Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(c) In a proper case any incidental and consequential damages under the next section may also be recovered.

(2) § 2.715 Buyer's Incidental and Consequential Damages

(a) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(b) Consequential damages resulting from the seller's breach include

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

We are of the opinion that Texsun may recover its consequential economic losses resulting from a breach of warranty on the part of Ralston provided that Texsun is able to clear the hurdles of contributory negligence and burden of proof with respect to lost profits and diminished business reputation.

*The Contributory Negligence Issue as to Breach of Warranty*

■ The jury (Answers to Special Issue No. 8) found Texsun contributorily negligent with regard to certain of its

5. In *Barbee*, the Supreme Court of Texas refused to extend the doctrine of strict liability to the prescription, fitting, and sale of contact lenses where there was no claim that the lenses were defective in themselves.

feeding and management practices, thereby proximately causing Texsun to suffer economic damages, but nevertheless rendered a verdict for Texsun. The district court reconciled these findings in the following manner:

"At first blush it would seem that this finding of proper intended use is in conflict with the finding of contributory negligence concerning the feeding and management practices of the Plaintiff. However the facts indicate in this case that the use of the ration supplement involves the proper mixing of same with other feeds and that many other things enter into feeding and management practices such as the maintenance of the premises, medicinal practices, etc. In other words, although they relate to the same overall operation, the negligence of the Plaintiff had nothing to do with its use and the manner in which it used the defective ration supplement in question, and the amount of damages inquired about in Special Issue No. 6 was limited to the damages suffered because of the Defendant's ration supplement and not that resulting from other causes." 311 F.Supp. at page 646.

We think it is appropriate to fix the frame of reference for our discussion by some preliminary observations of a general nature.

It is apparent from the Texas products liability cases, both the strict liability variety and those based on implied warranty, that the liability, while strict, is not absolute. This is to say simply that the manufacturer or seller is not an insurer. But liability in these types of cases is not predicated on negligence, and in the ordinary tort sense contributory negligence is not a defense. Thus, while contributory negligence may be a defense under certain circumstances to strict liability-implied warranty claims, all of the well-reasoned cases, those from Texas as well as elsewhere, make it clear that this defense applies only to defeat recovery of a very limited type. The following general statement, supporting

which numerous authorities are cited, appears in 2 Products Liability, Frumer and Friedman, Section 16.01(3), pages 320, 331:

"While there is authority to the contrary, it is arguably the better view that contributory negligence as such, as distinguished from misuse of the product, is not a defense * * *."

"Contributory negligence is the sense of a failure to discover a defect, or to guard against the possibility of its existence, is not a defense. *Contributory negligence in the sense of an unreasonable use of a product after discovery of the defect and the danger is a defense.* (Emphasis supplied.)"

We recognize also that if the plaintiff's negligence is the *sole* cause of his injuries, there may not be a recovery. This is not because a defense has been established by proof, but rather because the plaintiff has failed to prove any right to recover. The present case is of course not that situation.

While it is not necessary that we decide the point it is likely that without the plaintiff's attempt here to proceed on negligence issues, the defendant under the circumstances in evidence would not have been entitled to have the defensive issue of contributory negligence presented to the jury. At most, the special issue would have had to be framed to fit the limited type of contributory negligence applicable to strict liability-implied warranty situations. Certainly a broad general inquiry as to contributory negligence, as embodied by Special Issue No. 8 fails to meet the defendant's burden in a strict liability-implied warranty case.

We proceed now to a discussion of the Texas cases we deem of help in our decision.

Careful review of the Texas cases dealing with the defense of contributory negligence in products liability matters leads us to the conclusion that the court below correctly rejected Ralston's attempt to apply the finding of contributory negligence to the breach of warranty cause of action. This is so even

though the reported cases unfortunately deal with strict liability claims, not breach of warranty claims.

In Shamrock Fuel & Oil Sales Co., Inc. v. Tunks, Tex.Sup.Ct.1967, 416 S.W.2d 779, the plaintiff alleged that the flash point of kerosene supplied by Shamrock had been lowered through adulteration with gasoline. The Supreme Court of Texas held that the fact that the minor plaintiff was contributorily negligent in directing his brother to pour the kerosene on a smoldering stick taken from an incinerator and that such negligence was a proximate cause of the plaintiff's injuries would not bar the plaintiff from recovering on a strict liability theory. The companion case of McKisson v. Sales Affiliates, Inc., Tex.Sup.Ct.1967, 416 S.W.2d 787, was a products liability suit by the husband of a woman injured using a permanent wave preparation bought from the defendant's salesman. The Texas Supreme Court held that even if the plaintiff's wife, a beauty shop owner and operator, should have known that the preparation could not be safely applied to bleached hair, and even if the plaintiff's wife was negligent in directing one of her employees to apply the preparation to her hair, evidence supporting findings that the preparation was not reasonably fit for the use of giving permanent waves established a case of strict liability, thereby enabling the plaintiff to recover notwithstanding the wife's contributory negligence.

In F.M.C. Corporation v. Burns, Tex. Civ.App.1969, 444 S.W.2d 315, no writ history, a cucumber processor brought suit on a products liability theory against the manufacturer of a waxing machine and wax, alleging that the defendant's machine and wax had damaged seventy percent of the plaintiff's crop because of defects in both the machine and the wax. The court approved a jury instruction that in determining whether the product had been properly applied by the plaintiff, it should consider if the defendant had provided proper instructions or directions.

McDevitt v. Standard Oil Co. of Texas, 5 Cir. 1968, 391 F.2d 364, was a suit based on products liability brought in federal court under Texas law in which the owner of a station wagon and his wife sought damages for injuries to property and to the persons of the wife and six children resulting from the failure of the car's tires. The defendant, an automobile tire retailer, defended on the ground that the station wagon owner had knowingly exposed himself to the risk of tire failure by purchasing tires of improper size, by driving the car when the tires had been inflated to improper pressure levels, and by operating the car at excessive speeds over rough terrain. Under these circumstances, this Court held that contributory negligence was an appropriate defense.

The vital distinction between the concepts of contributory negligence and voluntary exposure to a known danger as defenses in products liability actions is clearly set forth by Dean Prosser in The Law of Torts, Third Edition, pages 538–540:

"It frequently is said that the contributory negligence of the plaintiff is not a defense in cases of strict liability. This involves the seemingly illogical position that the fault of the plaintiff will relieve the defendant of liability when he is negligent, but not when he is innocent. The explanation of an unreasonable risk to others by abnormal conduct which is inherent in most of the strict liability cases; and in part in the policy which places the absolute responsibility for preventing the harm upon the defendant, whether his conduct is regarded as fundamentally anti-social, or he is considered merely to be in a better position to transfer the loss to the community * * * At the same time, the defense which consists of voluntarily and unreasonably encountering a known danger, and in negligence cases passes more or less indiscriminately under the names contributory negligence and assumption of risk, will, in general, relieve the de-

fendant of strict liability. Here, as elsewhere, the plaintiff will not be heard to complain of a risk which he has encountered voluntarily, or brought upon himself with full knowledge and appreciation of the danger * * * Upon this basis, the kind of contributory negligence which consists of voluntary exposure to a known danger, and so amounts to assumption of risk, is ordinarily a defense * * * The plaintiff's appreciation of the risk, and his voluntary consent to encounter it, will often be a jury question and juries frequently are reluctant to find that a true consent has been given." [6]

As our discussion points up, our decision is a difficult one, but we reach the opinion, as did the district court, that Texsun's negligence in failing to utilize the steam flaking process and in its management practices did not operate to bar recovery against Ralston on a breach of implied warranty theory. We think Texsun's negligence was unrelated to Dr. Karr's erroneous instructions and did not involve misuse of Ralston's ration supplement or constitute a voluntary exposure to a known risk.

*The Lost Profits and Diminished Business Reputation Issue*

In setting aside the jury's award of $10,000.00 to Texsun for lost profits and diminished business reputation, the district court stated:

"It is the opinion of the Court that the amount of $10,000.00 damages to the business reputation and loss of profits is not supported by the evidence. It would appear to the Court that damages on this issue, under the evidence in this case, could be based only on speculation and conjecture and should not be allowed. Western Union Tel. Co. v. R. J. Jones & Sons, 211 F.2d

479 (5th Cir. 1954); Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (Tex.1938); Wade v. Southwestern Bell Tel. Co., 352 S.W. 2d 460 (Tex.Civ.App.—Austin, no writ history). An issue on loss of profits or damages should not have been submitted to the jury because there was no evidence to support a finding of the jury and this portion of the jury's verdict will be disregarded. Western Union v. R. J. Jones & Sons, *supra.*" (311 F.Supp. at page 646).

Western Union v. Jones was a diversity suit under Louisiana law arising out of the failure of the telegraph company to make timely delivery of a modification of a public works bid by plaintiff to the appropriate office of the State of Louisiana. The plaintiff's evidence regarding lost profits consisted essentially of its original cost estimate. We reversed the judgment for plaintiff for insufficient evidence and directed a judgment for the defendant telegraph company.

In Southwest Battery Corp. v. Owen, 1938, 131 Tex. 423, 115 S.W.2d 1097, the Supreme Court of Texas, in affirming an award of lost profits to a partnership which had been formed to distribute batteries manufactured by Southwest and which had suffered economic loss when Southwest failed to fill the partnership's orders, noted at page 1099 of 115 S.W.2d that it was "impossible to announce with exact certainty any rule measuring the profits the loss for which recovery may be had". That case held that the jury was properly permitted to consider the profit made by the plaintiff in its six month history previous to the breach of contract sued upon.

The plaintiff in Wade v. Southwestern Bell Telephone Co., Tex.Civ.App.1961, 352 S.W.2d 460, (no writ history) was

---

6. Frumer and Friedman, supra, at Section 1601.3, pages 3–20, Vol. 2, pertinently observes:

"While it is clear that plaintiffs need not prove negligence in warranty-products liability case, it is not clear whether contributory negligence as such is a

defense to such an action. While there is authority to the contrary, it is arguably the better view that contributory negligence as such, as distinguished from misuse of the product, is not a *defense* * * *." (emphasis supplied)

a lawyer in practice less than two years, whose name was inadvertently omitted from the yellow pages of its directory by the defendant telephone company. The Texas Court of Civil Appeals there held that the plaintiff had not established with reasonable and requisite certainty that the damages alleged were caused by the defendant's omission of the listing.

Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365, was decided en banc. There we established the rule for federal courts of this Circuit that in diversity cases they should "apply a federal rather than a state test for the sufficiency of evidence to create a jury question". 411 F.2d at page 368. The appropriate federal test was set forth in this language:

"On motions for directed verdict and for jugment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses". 411 F.2d at pages 374–375.

Under either Texas or Boeing v. Shipman standards, Texsun presented sufficient evidence on the issue of lost profits and diminished business reputation to survive Ralston's motions for directed verdict and for judgment notwithstanding the verdict. Texsun earned a $1,350.72 profit in the fiscal year ending September 30, 1966. The next year it showed a loss of $18,778.97 on lower sales. In fiscal year 1968 it suffered yet another loss. Possibly these losses were occasioned by factors other than the defect in Ralston's ration supplement. But the proved existence of these losses, coupled with the rebates, refunds, and adjustments which Texsun was forced to make to its customers in the spring of 1967, constituted a sufficient predicate for the jury's determination that Texsun suffered damage to the extent of $10,000.00 for lost profits and diminished business reputation. It was error to set aside that finding and enter judgment notwithstanding the verdict as to this issue.

The case will be reversed as to Texsun's cross-appeal.

The judgment is affirmed as to Ralston Purina's appeal; it is reversed as to Texsun's cross-appeal. Upon remand the district court will enter judgment for Texsun in the total amount of $37,000.00.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.